THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTURO HERRERA, | ) |
|       *Plaintiff*, | ) ) ) |
| v. | ) No. 19 C 8298 ) |
| DIMEO BROTHERS, INC., et al., | ) Judge Virginia M. Kendall ) ) |
|       *Defendants*. | ) ) |

## MEMORANDUM OPINION AND ORDER

A few weeks after Plaintiff Arturo Herrera, who is Hispanic and Mexican, began working for Defendant DiMeo Brothers, a white employee Tim Gavin asked Herrera about his citizenship, his tattoos, and whether he was a gang member. Over one year later, Herrera overheard Gavin use an ethnic slur to describe Mexican people on a phone call with another coworker. Additionally, Herrera believes Gavin vandalized his vehicles in the DiMeo Brothers' parking lot. Herrera brings ethnicity and national origin discrimination claims under Title VII, Section 1981, and the Illinois Human Rights Act against DiMeo Brothers and its owners, John and Mark DiMeo. He also alleges violations of the Fair Labor Standards Act and the Illinois Minimum Wage Law for improper overtime compensation. Herrera now moves for partial summary judgment on the wage claims. (Dkt. 67). Defendants move for summary judgment on all counts. (Dkt. 69). For the reasons below, Herrera's partial motion is denied, and Defendants' motion is granted in part and denied in part.

## BACKGROUND

On November 7, 2017, Plaintiff Arturo Herrera, who is Hispanic and Mexican, began working as a laborer for Defendant DiMeo Brothers, a construction company which Defendants Mark and John DiMeo own and operate. (Dkt. 75 ¶¶ 2–3, 5–6, 15; Dkt. 77 ¶¶ 1–2, 4, 8).

1

A.     **Herrera's Complaints of Discrimination**

Herrera's job responsibilities included moving materials between the DiMeo Brothers yard and job sites and repairing materials in the yard. (Dkt. 77 ¶ 8). Mark and John DiMeo supervised Herrera and had authority over hiring, firing, promotion, discipline, assignments, and pay. (Dkt. 75 ¶¶ 6–11; Dkt. 77 ¶¶ 18–19). Tim Gavin, who is white, is a mechanic and shop foreman. (Dkt. 77 ¶ 3). He "was in charge of the DiMeo Brothers yard and schedules." (*Id.*). Gavin also gave Herrera assignments, although he did not have hiring, firing, or disciplinary authority. (Dkt. 77 ¶¶ 18–19). DiMeo Brothers did not have a written employment policy concerning harassment or discrimination complaints. (Dkt. 80 ¶ 2). Nor did DiMeo Brothers provide anti-harassment training to its employees. (*Id.* at ¶ 3). Rather, Mark DiMeo told Herrera to report any problems to John DiMeo. (*Id.* at ¶ 4).

Herrera testified that, three or four weeks after he started working at DiMeo Brothers, Gavin asked him if he was a U.S. citizen. (Dkt. 77 ¶ 20). Gavin then asked him about his tattoos and if he was a gang member. (*Id.* at ¶ 20). Herrera spoke to John DiMeo about Gavin's questions, asking if Gavin "would always ask those type of questions." (*Id.* at ¶ 22; Dkt. 77-1 at 28–29). On a separate occasion, between March and May 2019, Herrera testified that he overheard Gavin use an ethnic slur to describe Mexicans during a phone conversation with another coworker. (Dkt. 77 ¶ 23). Herrera never complained about this incident. (*Id.* at ¶ 24).

Herrera further testified that Gavin observed him more strictly than other employees, including by staying at work until Herrera left to make sure that Herrera did not steal any tools, and taking pictures of him working. (*Id.* at ¶¶ 25–26; Dkt. 77-1 at 32–33). Herrera also believes that Gavin did not properly repair a truck, causing Herrera to injure his finger, which Gavin disputes. (Dkt. 77 ¶ 28). Herrera did not complain to DiMeo Brothers about Gavin's strict

2

supervision or botched truck repair. (*Id.* at ¶¶ 27, 28). On October 17, 2018, Herrera texted Gavin: "Thanks, T. Greatly appreciated this year. . . . I know I can count on you and Eric to cheer me up when I'm down. . . . I'm thankful that I found a workplace where I'm happy. God bless. Have a good night, Bubba." (*Id.* at ¶ 29; Dkt. 77-1 at 48).

Herrera claims that his and his wife's vehicles suffered damage in the DiMeo Brothers parking lot. (Dkt. 77 ¶ 30). More than once, Herrera found screws in the vehicles' tires, and he blames Gavin. (*Id.* at ¶¶ 31–32, 39). Herrera believes Gavin caused air to leak from his vehicle's tire valve because Gavin had the necessary tools and once asked Herrera "how his tire was doing." (*Id.* at ¶¶ 33–34). Further, Herrera believes Gavin threw rocks at his truck. (*Id.* at ¶¶ 35–38; Dkt. 80 ¶¶ 26–31).[1] Underlying Herrera's belief that Gavin was behind all the vandalism incidents are Gavin's questions about citizenship, tattoos, and gang membership. (Dkt. 77 ¶ 39).

On April 5, 2019, Herrera sent John DiMeo a video recording, purportedly showing a rock damaging his windshield, which John and Mark DiMeo both viewed. (*Id.* at ¶¶ 40–41). Herrera also sent John DiMeo a text message about the incident: "Now I'm not saying [Gavin] did it, but I don't know who else could have broke my wind screen." (*Id.* at ¶ 40). John and Mark DiMeo reviewed Herrera's video and did not investigate further. (Dkt. 80 ¶ 31).

On May 16, 2019, Herrera texted John DiMeo saying that he found rocks on the hood of his car and a crack on his new windshield. (Dkt. 77 ¶ 42). In response, John DiMeo told Herrera to park his vehicle next to Gavin's, within view of the company's security cameras. (*Id.*) Herrera also blames Gavin for damaging his truck's transmission harness on June 13, 2019. (*Id.* at ¶¶ 43–44). The same day, Herrera reported the incident to John DiMeo, who asked Gavin if he had

---

[1] Herrera's truck's dashboard camera recorded videos capturing noises which Herrera claims are from rocks hitting his car. (Dkt. 77 ¶¶ 35–38; Dkt. 80 ¶¶ 26–31). In one of these videos, Gavin walks in front of Herrera's truck about twenty seconds after a noise occurs. (Dkt. 77 ¶ 38; Dkt. 80 ¶ 27).

3

damaged the transmission harness. (*Id.* at ¶ 45). Gavin denied it. (*Id.*) Indeed, Gavin has denied ever damaging Herrera's or his wife's vehicles. (*Id.* at ¶ 49). After Herrera complained about the vandalism, he claims that Mark DiMeo expressed his disbelief, which Mark DiMeo denies. (*Id.* at ¶ 68). Herrera also claims Mark DiMeo told him to "go work in the field" despite Herrera "having a finger restriction," which Mark DiMeo also denies. (*Id.*)

On June 17, 2019, Herrera claims that Gavin threatened Herrera that he would lose his job if he continued to complain. (Dkt. 80 ¶ 13). Gavin denies saying this. (*Id.*) Herrera also claims that DiMeo Brothers' superintendent, Pete Volkening, called and told Herrera "to stop complaining about his vehicle," which Defendants dispute. (*Id.* at ¶ 14). Herrera also claims that Mark DiMeo yelled at him and told him "that if he wanted to lose his job over a truck to go home." (*Id.* at ¶ 15). Mark DiMeo also allegedly said that he would take Gavin's side "no matter what," and asked Herrera if he was trying to "make his guys look bad." (*Id.* at ¶¶ 16, 18). Mark DiMeo denies making these statements. (*Id.* at ¶¶ 15–16, 18). On a phone call on June 17, 2019, John DiMeo told Herrera that he "got everybody fired up with [who he thought damaged his vehicles]. Okay? And you've got a person that's been here since we put up the shop that's been very loyal to us and that's a huge accusation . . . ." (*Id.* at ¶ 21).

Herrera resigned on June 17, 2019 by texting John DiMeo: "I quit. I'm not going to put up with harassment." (Dkt. 77 ¶ 50). Herrera resigned because "nothing was done," and he believed that "something worse would happen" if he stayed. (*Id.* at ¶ 51). The day after he resigned, Herrera called John DiMeo and said, "I'm not accusing anybody," and "I'm not saying [Gavin] did it"— meaning, damaged his or his wife's vehicles. (*Id.* at ¶¶ 52–54). During that phone call, John DiMeo said:

> You've gotta understand, we've worked with [Gavin] for 15 years, we're gonna defend him. . . . . I'm not going to take out my best guy that I've had you know over

4

> 15 years over . . . a rock. . . . We're running a business here. . . . [H]e's been here 15 years taking care of our shop for us. So unless if I see his face and arm throw something at your car, I'm not going to do anything honestly.

(Dkt. 80 ¶ 25).

**B.     Herrera's Compensation**

At the beginning of Herrera's employment, DiMeo Brothers agreed to pay Herrera for 40 hours of work per week, even if Herrera worked less. (Dkt. 81 ¶¶ 6–7). DiMeo Brothers also agreed to pay Herrera overtime when he worked more than 40 hours per week after subtracting hours for when Herrera arrived at work late or left early. (*Id.* at ¶ 7). Herrera understood the initial agreement governing his pay to be temporary. (Dkt. 77-1 at 18). During busier times of year, DiMeo Brothers agreed to pay Herrera a guaranteed 45 hours per week including five hours of overtime pay. (*Id.* at 25; Dkt. 77-4 at 44–45).[2]

Herrera recorded the number of hours he worked on time sheets and submitted them to DiMeo Brothers, as the company required. (Dkt. 75 ¶¶ 22, 40; Dkt. 77 ¶ 10).[3] Herrera's hours varied. (Dkt. 77 ¶ 11). Herrera testified that, when he started the job, Mark DiMeo told him to write eight hours on his time sheets, which Mark DiMeo denies. (*Id.* at ¶ 13; Dkt. 77-1 at 18; Dkt. 77-4 at 40). Regardless, Herrera recorded his overtime hours "as a habit." (Dkt. 77 ¶ 13; Dkt. 77-1 at 26). DiMeo Brothers' accountant reviewed Herrera's time sheets, and Mark DiMeo reviewed the accountant's work. (Dkt. 77 ¶ 16). Herrera's pay stubs reflect the weekly hours for which DiMeo Brothers paid him. (*Id.* at ¶ 17).

On January 19, 2018, DiMeo Brothers paid Herrera for 38 hours of work following a pay period for which Herrera recorded 39 hours of work. (*Id.* at ¶¶ 25–26; Dkt. 66-6 at 3–4). Similarly, DiMeo paid Herrera for 40 hours of work on both February 16 and 23, 2018, after Herrera recorded

---

[2] The parties dispute which months comprised DiMeo Brothers' "busy season." (Dkt. 81 ¶ 10).
[3] The parties dispute whether Herrera recorded his hours accurately. (Dkt. 75 ¶¶ 22–23).

5

41 hours of work for each of the corresponding pay periods. (Dkt. 75 ¶¶ 27–30; Dkt. 66-6 at 5–8). The Court's review of Herrera's pay stubs and time sheets revealed discrepancies on 27 additional dates—totaling more than 50 hours that appeared on Herrera's time sheets but not his pay stubs. (Dkt. 66-6).[4] Defendants dispute that Herrera's time sheets accurately reflect the number of hours he worked. (Dkt. 75 ¶¶ 22–23; Dkt. 81 ¶ 9). Sometimes, Herrera arrived late to work or left early, and the parties dispute whether Herrera recorded hours he did not work. (Dkt. 81 ¶¶ 16–20). On January 24, 2018, Herrera sent a text message to Gavin saying he "might come in late" but then recorded and received payment for eight hours for that day. (*Id.* at ¶ 17). And on June 1, 2018, Herrera texted Mark DiMeo in the afternoon saying "I'm taking off I'll makeup [sic] the hours next week" but recorded and received payment for nine hours for that day. (*Id.* at ¶ 18).

Herrera also texted Mark DiMeo on February 11, 2019 saying, he needed "to take off early and make up hours." (*Id.* at ¶ 19). Mark DiMeo testified that he accurately reconciled Herrera's overtime hours. (*Id.* at ¶¶ 21). By contrast, Herrera testified that he sometimes recorded fewer

---

[4] On March 2, 2018, Herrera received payment for 40 hours after recording 42. (Dkt. 66-6 at 9–10). On March 23, 2018, Herrera received payment for 40 hours after recording 41. (*Id.* at 11–12). On March 30, 2018, Herrera received payment for 40 hours after recording 42. (*Id.* at 13–14). On April 6, 2018, Herrera received payment for 40 hours after recording 41. (*Id.* at 15–16). On April 13, 2018, Herrera received payment for 40 hours after recording 43. (*Id.* at 17–18). On April 27, 2018, Herrera received payment for 36 hours after recording 38. (*Id.* at 19–20). On June 1, 2018, Herrera received payment for 45 hours after recording 48. (*Id.* at 21–22). On June 15, 2018, Herrera received payment for 45 hours after recording 48. (*Id.* at 23–24). On June 22, 2018, Herrera received payment for 45 hours after recording 46. (*Id.* at 25–26). On August 3, 2018, Herrera received payment for 45 hours after recording 46. (*Id.* at 27–28). On August 10, 2018, Herrera received payment for 45 hours after recording 45.5. (*Id.* at 29–30). On September 14, 2018, Herrera received payment for 36 hours after recording 37. (*Id.* at 31–32). On September 21, 2018, Herrera received payment for 50 hours after recording 59. (*Id.* at 33–34). On September 28, 2018, Herrera received payment for 45 hours after recording 46. (*Id.* at 35–36). On October 5, 2018, Herrera received payment for 45 hours after recording 46. (*Id.* at 37–38). On October 26, 2018, Herrera received payment for 45 hours after recording 47. (*Id.* at 39–40). On February 15, 2019, Herrera received payment for 40 hours after recording 43. (*Id.* at 41–42). On February 22, 2019, Herrera received payment for 40 hours after recording 43. (*Id.* at 43–44). On March 1, 2019, Herrera received payment for 40 hours after recording 42. (*Id.* at 45–46). On March 8, 2019, Herrera received payment for 40 hours after recording 41. (*Id.* at 47–48). On March 22, 2019, Herrera received payment for 40 hours after recording 42. (*Id.* at 49–50). On March 29, 2019, Herrera received payment for 40 hours after recording 41. (*Id.* at 51–52). On April 5, 2019, Herrera received payment for 40 hours after recording 42. (*Id.* at 53–54). On May 17, 2019, Herrera received payment for 45 hours after recording 46. (*Id.* at 55–56). On May 24, 2019, Herrera received payment for 45 hours after recording 46. (*Id.* at 57–58). On May 31, 2019, Herrera received payment for 45 hours after recording 47. (*Id.* at 59–60). On June 14, 2019, Herrera received payment for 45 hours after recording 46. (*Id.* at 61–62).

hours than he worked. (Dkt. 77-1 at 15–16, 25). Further, Mark DiMeo testified: "We would owe [Herrera] $120. So divided by his rate would be the actual hours off." (Dkt. 75 ¶ 39; Dkt. 77-4 at 35). The parties therefore dispute whether DiMeo Brothers paid Herrera for all the hours he worked or paid Herrera 1.5 times his regular pay rate for his work above 40 hours per week on the appropriate pay dates. (Dkt. 75 ¶¶ 27–30; Dkt. 80 ¶ 32).[5]

**C.      Procedural History**

Herrera brought this action on December 19, 2019, (Dkt. 1), and he filed an Amended Complaint on July 31, 2020 (Dkt. 34). Following the Court's partial dismissal of certain counts, (Dkt. 54), the Amended Complaint's surviving claims against DiMeo Brothers and John DiMeo are for: discrimination, harassment, and constructive discharge based on ethnicity and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I) and the Illinois Human Rights Act (IHRA), 775 ILCS 5/2-101 *et seq.* (Count II); discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count IV); failure to pay overtime in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* (Count VI) and the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1 *et seq.* (Count VII). (Dkt. 34).[6]

---

[5] On June 26, 2020, after Defendants learned that Herrera would be bringing a claim for wage violations, DiMeo Brothers sent Herrera a letter and $3,151.60 in "an effort . . . to rectify any dispute about overtime hours." (Dkt. 77 ¶¶ 63–64; Dkt. 77-2 at 63). With the letter, DiMeo Brothers included a chart showing the difference in hours between Herrera's pay stubs and the hours he recorded on time sheets. (Dkt. 77 ¶¶ 65–66; Dkt. 80 ¶¶ 34–35). Defendants challenge the chart's admissibility under Federal Rule of Evidence 408. (Dkt. 74 at 12–13; Dkt. 80 ¶¶ 34–37). Rule 408 makes inadmissible evidence of an offer of "a valuable consideration in compromising or attempting to compromise a claim" or of "conduct or a statement made during compromise negotiations about the claim" "to prove or disprove the validity or amount of a disputed claim." Fed. R. Civ. P. 408; *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 540 (7th Cir. 2017) ("[S]tatements made in settlement negotiations are inadmissible to prove liability on the underlying claim . . . ."). Defendants sent Herrera the letter and accompanying chart as an attempt to settle his wage claims, and Herrera has offered the evidence only to prove DiMeo Brothers' liability for the same claims. *See Wine & Canvas*, 868 F.3d at 540. Accordingly, the evidence is inadmissible, and Herrera cannot rely on it to show his entitlement to summary judgment or the existence of a triable issue of fact. *See Johnson v. Meyers*, 53 F.4th 1063, 1067 (7th Cir. 2022) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment" (quoting *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009))).
[6] Although Herrera's Amended Complaint names Tim Gavin as a defendant, Herrera stipulated to the dismissal of Gavin as a defendant on March 9, 2022. (Dkt. 83).

On October 11, 2022, this case was reassigned from the Honorable Robert M. Dow Jr. (Dkt. 85). Before the Court are the parties cross-motions for summary judgment: Herrera moves for partial summary judgment on Counts VI and VII, (Dkt. 67), and Defendants move for summary judgment on all counts. (Dkt. 69).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there is "sufficient evidence" for a jury to return a verdict in favor of the party opposing summary judgment. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). On cross-motions for summary judgment, the Court "construe[s] all facts and inferences in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 943 F.3d 1012, 1016 (7th Cir. 2020). "The non-movant must, however, present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

## DISCUSSION

### I. Discrimination (Counts I, II & IV)

#### A. Harassment

To survive summary judgment on a hostile work environment claim under Title VII, Section 1981, or the IHRA, the "plaintiff must show: (1) unwelcome harassment; (2) based on a

protected characteristic; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 977 (7th Cir. 2021); *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (applying the same legal standard to claims under Title VII, Section 1981 and the IHRA). Courts consider the totality of circumstances to evaluate a hostile work environment claim, including "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Boss v. Castro*, 816 F.3d 910, 919–20 (7th Cir. 2016)); *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace.").

Herrera's evidence is insufficient to support the second or third prongs. Herrera leans on a conversation in which Gavin questioned Herrera about his citizenship, his tattoos, and whether he was a gang member. Although Gavin's questions were insensitive, the exchange reflected "immature and ignorant behavior" at most. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 546 (7th Cir. 2011). Then, Gavin's use of a derogatory slur in an overheard phone call with another coworker—an "offensive utterance"—was the only other conduct Herrera points to with any connection to Herrera's protected traits. *See Abrego*, 907 F.3d at 1015. While "[i]ncidents directed at others and not the plaintiff" may be relevant, "the more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace." *Yancick*, 653 F.3d at 545 (citations omitted). Although troubling, Gavin's use of a slur toward someone other than Herrera did not alter

9

Herrera's working conditions. *See id.* These two "isolated incidents," together with Gavin's strict supervision of Herrera, do not paint a picture of severe or pervasive harassment. *See Swyear*, 911 F.3d at 881.

Nor can Herrera rely on these two incidents to color the remainder of Gavin's conduct as discriminatory. "[A]lleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1160 (7th Cir. 2014) (quoting *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863–64 (7th Cir. 2005)) (affirming summary judgment against plaintiff where "only two of the incidents that she offered into evidence ha[d] any relation whatsoever to her national origin"); *see also Gosey v. Aurora Med. Ctr.*, 749 F.3d 603, 605 (7th Cir. 2014) (ruling that the plaintiff's "inability to point to evidence suggesting that the harassment was based on her race is fatal to her claim").

Even assuming Herrera's evidence is sufficient to suggest that Gavin damaged his vehicles several times over the course of two years,[7] Herrera has not "sufficiently connected" these incidents of vandalism to Gavin's hostility toward his protected traits. *See Zayas*, 740 F.3d at 1160. Considering the totality of circumstances, Herrera's evidence cannot support a reasonable jury finding that Gavin's conduct amounted to severe or pervasive harassment based on Herrera's ethnicity or national origin.[8] Thus, Herrera's harassment claims do not survive summary judgment.

---

[7] To the extent Herrera blames Gavin for these incidents because of his offensive questions about citizenship, tattoos, and gang membership, the inference is speculative at best. *See Giles*, 914 F.3d at 1048. Only two of the incidents have further evidentiary support. First, one of Herrera's dashboard camera videos shows that Gavin was in the area when a noise occurred, which Herrera claims was a rock hitting his car. Second, Gavin asked Herrera about his tire after the tire valve was damaged. Nonetheless, the inference that Gavin threw rocks at Herrera's car or damaged his tire valve is speculative.

[8] The parties argue over whether Gavin was Herrera's supervisor. (Dkt. 72 at 10–12; Dkt. 78 at 13–14). Even assuming Herrera' evidence creates a genuine dispute of fact on this issue, the harassment claims cannot survive.

10

**B.     Disparate Treatment**

Nor has Herrera raised any triable issues of fact as to his direct discrimination claims.[9] A plaintiff may defeat summary judgment by making out a prima facie case under the *McDonnell Douglas* framework—showing "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020)); *see also Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016) (noting that the analytical framework for claims under Title VII, Section 1981 and the IHRA is "essentially identical" (quoting *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012))).

Yet, using the *McDonnell Douglas* framework to oppose summary judgment is optional: according to *Ortiz*, the determinative question is "whether a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763–64 (7th Cir. 2016)). Whether proceeding under *McDonnell Douglas* or *Ortiz*—and Herrera tries both—his claims fall short.

---

[9] The Court notes that Defendants' treatment of Herrera's direct discrimination claims is cursory—almost to the point of waiver. Within the section of its brief discussing Herrera's harassment claim, Defendants argue: "Plaintiff cannot establish that a reasonable jury would conclude Gavin's actions created a 'convincing mosaic of circumstantial evidence' supporting an inference of intentional discrimination." (Dkt. 72 at 9 (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011)). But "'convincing mosaic' is not a legal test." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Although Defendants expand on the argument with respect to Herrera's intentional discrimination claims in reply to Herrera's response, (Dkt. 79 at 3–6, 12), they offer scant legal authority to support their arguments (Dkt. 72 at 7–14; Dkt. 79 at 3–6, 12). The Court has no obligation "to research and construct the legal arguments open to parties." *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988)). So when parties fail to develop an argument, the result is often waiver. *See Riley*, 909 F.3d at 190. Nonetheless, the Court will resolve Defendants' motion on Herrera's intentional discrimination claims because the record is clear, and Herrera's substantive response opposing summary judgment on these claims shows that he had fair notice that the claims' survival is at stake.

11

Under *McDonnell Douglas*, the fourth element requires a showing that the plaintiff received less favorable treatment "than a similarly situated employee outside his protected class." *Id.* at 892. A similarly situated employee "need not be identical in every conceivable way," but they "must be 'directly comparable' to the plaintiff 'in all material respects.'" *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Opposing summary judgment, Herrera argues "that others outside of his protected class were treated more favorably than [him]." (Dkt. 78 at 14). The two paragraphs Herrera cites in support of this conclusion do not support his claim. Those paragraphs state that: (1) Gavin used an ethnic slur; and (2) John DiMeo expressed his loyalty toward Gavin on the phone with Herrera following his resignation. (Dkt. 80 ¶¶ 6, 25). Herrera fails to point to any similarly situated employee outside of his protected class. For example, Herrera claims that Gavin supervised him more strictly than other employees, but he has not introduced evidence that any of the employees who received more lenient supervision were outside of Herrera's protected class and otherwise "directly comparable" to him "in all material respects." *See Reives*, 29 F.4th at 892. Accordingly, Herrera cannot make out a prima facie case.

Considering the evidence holistically, according to *Ortiz*, Herrera's disparate treatment claims fare no better. The evidence on the record would not permit a reasonable jury to find that Herrera suffered an adverse employment action because of his ethnicity or national origin. *See Reives*, 29 F.4th at 893–94. Gavin's insulting questions on one occasion and his use of a slur toward another coworker are the only pieces of evidence implicating Herrera's ethnicity or national origin. But there is no other evidence that would allow a jury to find a link between these troubling instances and any adverse employment action. Thus, Herrera's disparate treatment claims fail.

12

### C. Retaliation

To survive summary judgment on a Section 1981 retaliation claim, the plaintiff must show "that (1) he engaged in statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) the adverse action was caused by the protected activity." *Miller v. Chi. Transit Authority*, 20 F.4th 1148, 1155 (7th Cir. 2021). Herrera's claim hits a wall on the first element.

Complaining is not a protected activity unless the complaints have a connection to a protected characteristic such as ethnicity or national origin. *Id.* ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006))). None of Herrera's complaints about Gavin's conduct indicated a connection to Herrera's ethnicity or national origin. For example, Herrera conveyed Gavin's questions about citizenship, tattoos, and gang membership to John DiMeo by asking whether Gavin "would always ask those type of questions"—failing to suggest that Herrera perceived a connection between the questions and his protected traits. (Dkt. 77 ¶ 22; Dkt. 77-1 at 28–29). Nor did Herrera's complaints about vandalism attribute any of Gavin's alleged misconduct to Herrera's ethnicity or national origin. *See Miller*, 20 F.4th at 1155. Since a reasonable jury could not find that Herrera engaged in statutorily protected activity, his retaliation claim fails.

### D. Constructive Discharge

There are two ways for a plaintiff to show constructive discharge. *Scaife v. U.S. Dep't of Veteran Affairs*, 49 F.4th 1109, 1119 (7th Cir. 2022). The first way is to "demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." *Id.* (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008)). The

13

failure of Herrera's hostile work environment claim therefore dooms his constructive discharge claim under this higher standard. *See id.*

The second way to prevail on a constructive discharge claim is no more availing: it requires the plaintiff to show that he had to resign because his "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign." *Id.* (quoting *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022)). Working conditions are intolerable where an employer effectively communicates "to a reasonable employee that [he] will be terminated," and he resigns. *Id.* (quoting *Fischer*, 519 F.3d at 409). Put differently, the employer's conduct must have suggested that "'the handwriting [was] on the wall' and the axe was about to fall." *Id.* (quoting *Fischer*, 519 F.3d at 409). Herrera resigned because "nothing was done," and he believed that "something worse would happen" if he did not resign. (Dkt. 77 ¶ 51). Herrera has not produced any evidence suggesting that DiMeo Brothers forced him out or intimated that the handwriting of his termination was on the wall. *See id.* Thus, neither method of proving constructive discharge presents a path to victory for Herrera.

Defendants are entitled to summary judgment on Counts I, II, and IV. The Court turns next to the parties' cross-motions for summary judgment on Herrera's wage claims.

## II. Wage Violations (Counts VI & VII)

As to both parties' motions on Herrera's wage claims, genuine factual disputes preclude summary judgment. The FLSA and IMWL provide that "no employer shall employ any of his employees . . . for a workweek longer than forty hours" without paying the employees overtime pay. 29 U.S.C. § 207(a); 820 ILCS 105/4a(1); *Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672–73 & n.3 (7th Cir. 2010) (analyzing FLSA and IMWL claims together). The employee "has the burden of proving that he performed work for which he was not properly compensated."

14

*Melton v. Tippecanoe County*, 838 F.3d 814, 818 (7th Cir. 2016). If the employee alleges the employer kept inaccurate records, he must "prove[] that he has in fact performed work for which he was improperly compensated and . . . produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by* 29 U.S.C. §§ 251–62)). Then, the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence negative to the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (quoting *Anderson*, 328 U.S. at 687–88).

Herrera points to three instances where his pay stub showed that he received compensation for one hour less than he recorded on his time sheet for the corresponding pay period. (Dkt. 75 ¶¶ 25–30). Herrera claims that the three instances are "examples" of the "multiple occasions" on which he received improper compensation, (Dkt. 75 ¶¶ 24–30), citing generally to 36 pay stubs and corresponding time sheets. (*See* Dkt. 66-6). The Court is "not required to scour the record looking for factual disputes . . . [or] to piece together appropriate arguments," *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995))). Yet, discrepancies jump off the page: in addition to the three dates Herrera noted, the Court's review of Herrera's pay stubs and time sheets revealed discrepancies on an additional 27 pay dates. (Dkt. 66-6 at 9–62). In total, Herrera has produced evidence showing that over 50 hours recorded on his time sheets were absent from his pay stubs. Herrera has also pointed to Mark DiMeo's testimony that DiMeo Brothers "owe[s] [Herrera] $120"—suggesting that the company's accounting was not airtight. (Dkt. 75 ¶ 39; Dkt. 77-4 at 35). In total, Herrera's evidence supports

a "just and reasonable inference" that Herrera received improper compensation, satisfying his initial burden. *See Melton*, 838 F.3d at 818.[10]

Then, although Defendants have shown two instances where Herrera sent messages indicating that he intended to work fewer hours than the number he recorded and received payment for, Defendants have not demonstrated the precise amount that Herrera worked or negated the reasonableness of the inference that Herrera received improper compensation. Moreover, Defendants' reliance on *Turner v. The Saloon*, 595 F.3d 679 (7th Cir. 2010), is inapposite. (*See* Dkt. 74 at 11). The plaintiff in *Turner* provided *no* support for his claim that his employer improperly compensated him—relying solely on his own say-so. *Id.* at 690–91. Here, by contrast, Herrera supports his claim with evidence of discrepancies between his time sheets and pay stubs and testimony by Mark DiMeo that DiMeo Brothers owes Herrera money. Thus, the wage claims arrive at a standstill: there are disputed material facts as to whether Herrera's time sheets were accurate or whether DiMeo Brothers properly reconciled Herrera's compensation for the days he arrived late or left early.

In their response brief opposing Herrera's motion, Defendants assert that DiMeo Brothers paid Herrera appropriately using the fluctuating workweek (FWW) method. (*See* Dkt. 74 at 9–11). This argument is unconvincing. The FWW method provides an alternative method of calculating overtime. When it applies, it allows employers to pay employees with fluctuating workweeks half-time instead of time-and-one-half overtime. *See* 29 C.F.R. § 778.114(a); 56 ILAC § 210.430(f); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002). But the FWW method does not

---

[10] As noted above, Herrera cannot prove DiMeo Brothers' liability by relying on the spreadsheet that DiMeo Brothers created and sent him as part of its effort to settle these claims. (*See* Dkt. 68 at 4–5; 82 at 3); Fed. R. Evid. 408. Nor can Herrera rely on new evidence submitted for the first time in his reply brief to which Defendants have had no opportunity to respond. (*See* Dkt. 82 at 4); *Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 969 (7th Cir. 2020 ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." (citation omitted)).

apply here. "Fluctuating" is a technical term: to fit the bill, an employee must "receive[] a fixed salary no matter how many hours the work requires that week. . . . The salary is not diminished even if the number of hours falls below 40, nor is the employee expected to make them up in the future." *Heder*, 295 F.3d at 779–80; *see also Unrikis-Negro*, 616 F.3d at 683. Here, Herrera's pay stubs show that he received compensation for fewer than 40 hours of work on January 19, 2018, April 27, 2018, and September 14, 2018. (Dkt. 66-6 at 3–4, 19–20, 31–32). Since DiMeo Brothers did not pay Herrera a fixed salary regardless of the hours he worked, the FWW method is of no use to Defendants. *See Heder*, 295 F.3d at 779–80.

Thus, neither party has shown their entitlement to judgment as a matter of law based on the undisputed facts. Rather, the presence of disputed material facts makes summary judgment as to Counts VI and VII inappropriate.

## CONCLUSION

For the reasons above, Herrera's motion for partial summary judgment is denied, (Dkt. 67), and Defendants' motion for summary judgment is granted in part and denied in part. (Dkt. 69). Herrera's discrimination claims in Counts I, II, and IV fail. His wage claims in Counts VI and VII survive.

_____
Virginia M. Kendall
United States District Judge

Date: March 16, 2023